

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-8-1995

# Squires v Bonser

Precedential or Non-Precedential:

Docket 94-7035

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Squires v Bonser" (1995). *1995 Decisions.* Paper 122.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/122

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 94-7035
_____

JOSEPH SQUIRES, SR.
Appellant

v.

THOMAS BONSER; JAY E. HUFFMAN;
MIDDLE SMITHFIELD TOWNSHIP
Appellees

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. No. 92-00908
_____

Argued September 20, 1994
_____

Before: BECKER and COWEN, Circuit Judges
and POLLAK, District Judge[*]

(Filed  May 8, 1995)
_____

                          Cletus P. Lyman, Esq. (argued)
                          Lyman & Ash
                          1612 Latimer Street
                          Philadelphia, PA  19103

                              Attorney for Appellant

                          Angela L. Dumm, Esq. (argued)
                          Marshall, Dennehey, Warner,

_____

[*].  Honorable Louis H. Pollak, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

Coleman & Goggin
1845 Walnut Street
Philadelphia, PA  19103
Attorney for Appellees

_____

OPINION OF THE COURT
_____

POLLAK, District Judge.


This appeal addresses the district court's denial of reinstatement in a case arising under 42 U.S.C. § 1983.  The jury sustained appellant's constitutional claim, finding that appellees' decision not to reappoint appellant to a further annual term as township working roadmaster was predicated on appellant's exercise of his First Amendment rights; accordingly, the jury awarded damages to appellant.  But the district court, in the exercise of its equitable discretion, declined to direct that appellant be reinstated as working roadmaster.  On review of the reasons assigned by the district court for not ordering reinstatement, we conclude that those reasons do not adequately support the district court's decision not to provide make-whole relief.  Accordingly, we will reverse the judgment of the district court and remand for entry of an order of reinstatement and for a new trial on compensatory damages.


**I**

Appellant Squires, appellee Bonser, and appellee Huffman constitute[1] the membership of Middle Smithfield Township's board of township supervisors (hereinafter "the Board"). The three-member Board is responsible for "[t]he general supervision of the affairs of the township." 53 Pa. Cons. Stat. Ann. § 65510.[2] Squires, a Republican, has served on the Board since January 1, 1984. Bonser and Huffman, both Democrats, have served on the Board since, respectively, January 1, 1976, and January 1, 1986.

Included among the Board's powers is that of appointing superintendents or roadmasters to work on and maintain the roads. Pennsylvania law expressly allows for a member of the Board to

---

[1]. In using the present tense, we characterize the case as it stood when the record and briefs on appeal were filed; the parties have not suggested, either at oral argument in this court or thereafter, that the posture of the case has undergone any significant change.

[2]. Middle Smithfield Township is organized pursuant to the Second Class Township Code, 53 Pa. Cons. Stat. Ann. § 65101 et. seq. Section 65510 provides in full:

> The general supervision of the affairs of the township shall be in the hands of three registered electors of the township, who shall be styled township supervisors, except that when upon referendum the election of two additional supervisors is provided for, the general supervision of the affairs of the township shall be in the hands of five registered electors of the township, who shall be styled township supervisors.

53 Pa. Cons. Stat. Ann. § 65510 (Supp. 1994).

serve as a superintendent or roadmaster.  <u>See</u> 53 Pa. Cons. Stat. Ann. § 65514.[3]

From 1984 through 1989, Squires held the position of part-time roadmaster.  In January, 1990, Squires was appointed by the Board at its annual reorganizational meeting to the full-time position of working roadmaster, a position in which Squires had responsibility for supervising the construction, maintenance, and

---

[3].  Section 65514 provides in part:

> The board of township supervisors, immediately after their organization, shall divide the township into one or more road districts.  They shall employ a superintendent for the entire township or a roadmaster for each district. . . .  The supervisors shall fix the wages to be paid . . . to the superintendent or roadmasters and laborers for work on the roads and bridges, which wages shall not exceed wages paid in the locality for similar services.
>
> This section shall not prohibit the township supervisors from being employed as superintendents or roadmasters, or as laborers, if physically able to work on and maintain the roads.  With regards to boards of supervisors which are designated as three-member boards, any supervisor who is to be considered by such a board for position as a compensated employee of the township, as authorized by this section, shall not be excluded from voting on the issue of such appointment; such action shall be deemed to be within the scope of authority as a supervisor and shall not be deemed to constitute an illegal or an improper conflict of interest.

53 Pa. Cons. Stat. Ann. § 65514 (Supp. 1994).

repair of the Township's roads. Squires' appointment as working roadmaster had the support of both Bonser and Huffman. Squires was reappointed to the position in January 1991, again with the support of Bonser and Huffman. In January 1992, Squires was not reappointed and Bonser became the working roadmaster.

On July 2, 1992, Squires instituted this § 1983 action against Bonser, Huffman, and the Middle Smithfield Township, contending that his non-reappointment to the position of working roadmaster constituted a violation of his First Amendment rights. Specifically, Squires undertook to show at trial that the non-reappointment occurred in retaliation for: (1) comments made by Squires to Huffman in 1991 in which Squires defended his son's candidacy for a position on the Board;[4] and (2) criticism by Squires in 1988, 1989, and 1991 of Huffman's participation in certain township matters — in particular, Squires' allegations that Huffman, an electrical contractor, had a conflict of interest in performing contracting work for several developers who had matters pending before the Board.

On April 27, 1993, the jury returned a verdict for Squires, awarding him $37,100 in compensatory damages and $1,500 in punitive damages. On May 7, 1993, Squires filed a motion with the district court for reinstatement to the position of working

_____

[4]. Squires' son ran against Huffman in the November 1991 election for a position on the Board. Huffman won the election. 2 App. at 291.

roadmaster.  The motion for reinstatement was denied on December 14, 1993.  Squires has appealed.

## II

### A

Reinstatement is an equitable remedy available in unconstitutional discharge cases arising under § 1983.  <u>Versarge v. Township of Clinton, New Jersey</u>, 984 F.2d 1359, 1368 (3d Cir. 1993).[5]  The decision whether to award reinstatement thus lies within the discretion of the district court.

In reviewing an order denying reinstatement, we do not substitute our judgment for that of the district court.  We do, however, have an obligation to examine whether the equitable factors considered by the district court and the weight given to those factors are appropriate in light of the purposes underlying

---

[5].  Section 1983, authorizing both legal and equitable relief, provides in pertinent part:

> Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1994).

the statutory cause of action.  As we stated in Gurmankin v.

Costanzo, 626 F.2d 1115 (3d Cir. 1980), cert. denied, 450 U.S.

923 (1981):

> Meaningful appellate review of the exercise
> of discretion requires consideration of the
> basis on which the trial court acted.  If the
> factors considered do not accord with those
> required by the policy underlying the
> substantive right or if the weight given to
> those factors is not consistent with that
> necessary to effectuate that policy, then the
> reviewing tribunal has an obligation to
> require the exercise of discretion in
> accordance with "what is right and equitable
> under the circumstances and the law."

Id. at 1119-1120 (quoting Langnes v. Green, 282 U.S. 531, 541

(1931)).  See also Albemarle Paper Company v. Moody, 422 U.S.

405, 417 (1975) ("[W]hen Congress invokes the Chancellor's

conscience to further transcendent legislative purposes, what is

required is the principled application of standards consistent

with those purposes . . . .").

In the context of discriminatory discharge actions

arising under Title VII, it is well established that the district

court's consideration of equitable remedies is to be guided by

the statute's central goals of make-whole relief and deterrence.

Id. at 417-22.  Thus, the denial of a make-whole remedy must be

supported by "reasons which, if applied generally, would not

frustrate the central statutory purposes of eradicating

discrimination throughout the economy and making persons whole

for injuries suffered through past discrimination."  Id. at 421

(addressing denial of backpay). See Franks v. Bowman Transp. Co., 424 U.S. 747, 771 (1976) (addressing denial of seniority relief) (quoting Albemarle Paper).[6] This court has previously recognized, for example, that denial of reinstatement may be appropriate in a Title VII action where "animosity between the parties makes such a remedy impracticable." Ellis v. Ringgold School Dist., 832 F.2d 27, 30 (3d Cir. 1987).

This action arises under § 1983, whose "purpose . . . is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 112 S. Ct. 1827, 1830 (1992). In 1871, in fashioning § 1983 — as, in 1991, it was to do in revising (with a view to strengthening) Title VII — Congress authorized courts to deploy both legal and equitable remedies. Under Title VII, the statute's make-whole purpose "is shown by the very fact that Congress took care to arm the courts with full equitable powers." Albemarle Paper, 422 U.S. at 418. The same is true under § 1983: the make-whole goal "[does] not differ when the basis of the underlying right is the Constitution rather than a statute such

---

[6]. Moreover, a district court, when denying make-whole relief, is required to articulate its reasons for doing so. See Franks v. Bowman Transp. Co., 424 U.S. at 774 ("[I]f the district court declines, due to the peculiar circumstances of the particular case, to award relief generally appropriate under Title VII, '[i]t is necessary . . . that . . . it carefully articulate its reasons' for so doing." (quoting Albemarle Paper, 422 U.S. at 421 n.14)).

as Title VII." Gurmankin, 626 F.2d at 1121.[7]  Because of this consonance of the underlying policy considerations, the framework of analysis governing reinstatement in Title VII actions also governs in § 1983 actions implicating First Amendment concerns; that is, a denial of reinstatement is unwarranted unless grounded in a rationale which is harmonious with the legislative goals of providing plaintiffs make-whole relief and deterring employers from unconstitutional conduct.  Cf. Gurmankin, 626 F.2d at 1121 (section 1983 cases involving "discrimination in employment based on stereotyped notions of ability . . . require[] equitable remedies comparable to those deemed appropriate in Title VII employment discrimination cases").

We appreciate that there may not be absolute congruence between the equitable remedies long accepted under Title VII and those conventional under § 1983, for the reason that, prior to the revision of Title VII in 1991, the remedies available under Title VII were entirely equitable, whereas § 1983 has always provided both legal and equitable relief.  Given the pre-1991 disparity between the two statutes' remedial arsenals, it has

_____

[7].  We have similarly recognized the make-whole purpose governing remedies for employment discrimination cases arising under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.  See Maxfield v. Sinclair Intern., 766 F.2d 788, 796 (3d Cir. 1985) ("The inclusion of equitable relief strengthens the conclusion that Congress intended victims of age discrimination to be made whole by restoring them to the position they would have been in had the discrimination never occurred."), cert. denied, 474 U.S. 1057 (1986).

been argued that the presumption in favor of reinstatement developed under pre-1991 Title VII case law should not be directly transferred to actions arising under § 1983.  See Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321-22 (1st Cir. 1989) (en banc) ("The fewer the available methods of redress, the more likely that 'sound legal principles' will counsel in favor of reinstatement as the relief of choice.").

We do not find it fruitful to explore how the "presumption" or "preference" in favor of reinstatement in the Title VII context compares in kind or degree with that applicable to reinstatement under § 1983.  Suffice it to say that, while the availability of legal relief under § 1983 — and now under Title VII — may influence the use of equitable remedies under these provisions, the central goals of make-whole relief and deterrence must guide a district court's consideration of reinstatement under both.  Reinstatement advances the policy goals of make-whole relief and deterrence in a way which money damages cannot.  As stated by the Eleventh Circuit in Allen v. Autauga County Board of Education, 685 F.2d 1302, 1306 (11th Cir. 1982):

> When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole.  The psychological benefits of work are intangible, yet they are real and cannot be ignored. . . . We also note that reinstatement is an effective deterrent in preventing employer retaliation against employees who exercise their constitutional rights.  If an employer's best efforts to remove an employee for unconstitutional reasons are presumptively unlikely to

> succeed, there is, of course, less incentive
> to use employment decisions to chill the
> exercise of constitutional rights.

See also Banks v. Burkich, 788 F.2d 1161, 1164 (6th Cir. 1986) ("The prospect of money damages will not be sufficient for many employees to overcome the otherwise chilling effect that accompanies the threat of termination.").  Thus, while the availability of money damages may have significance in the district court's consideration of remedies, reinstatement is the preferred remedy in the absence of special circumstances militating against it.  See Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 831 (3d Cir. 1994) ("The equitable remedy of reinstatement is available for discharges that violate 42 U.S.C. § 1983, and reinstatement is the preferred remedy to cover the loss of future earnings." (citations omitted)); id. at 835 (Garth, J., concurring in part and dissenting in part) ("It is well settled that reinstatement is the preferred remedy to avoid future lost earnings.").[8]  In sum, we think the First Circuit had it right in its well-reasoned en banc opinion in Rosario-Torres:

---

[8]   Cf. Robinson v. S.E. Pa. Transp. Auth., Red Arrow, 982 F.2d 892, 899 (3d Cir. 1993) (Title VII) ("[R]einstatement is the preferred remedy to avoid future lost earnings . . . ."); Ellis, 832 F.2d at 30 (Title VII) ("Reinstatement is the preferred remedy to avoid future lost earnings."); Blum v. Witco Chemical Corp., 829 F.2d 367, 373 (3d Cir. 1987) ("Back pay coupled with reinstatement is the preferred remedy to avoid future damages in ADEA cases."); Maxfield, 766 F.2d at 796 (ADEA) ("Reinstatement is the preferred remedy to avoid future lost earnings, but reinstatement may not be feasible in all cases.").

Whenever an ex-employee sues alleging wrongful dismissal by a government agency, job restoration may be a material aspect of meaningful relief. Yet in the real world, reinstatement in unlawful-discharge cases often will place some burden on the agency: there will likely be tension (or even hostility) between the parties when forcibly reunited; employees who have assumed duties previously performed by the fired worker will have to be displaced when he or she returns; and, as a result, the public's business may be conducted somewhat less efficaciously. Be that as it may, we agree with those courts which have ruled that such routinely "incidental" burdens, in their accustomed manifestations, are foreseeable sequelae of defendant's wrongdoing, and usually insufficient, without more, to tip the scales against reinstatement when first amendment rights are at stake in a section 1983 action.

We do not perceive such a positioning of the weighbeam as a departure from general equitable principles. It is, rather, merely a way of setting a starting-point for the district court's consideration. Once this is understood, the "presumption" of reinstatement becomes just the dress of thought, a shorthand manner of saying that equitable considerations different in kind or degree from those regularly accompanying reinstatement must be present if reinstatement is to be withheld from the victim of a first amendment infraction.

889 F.2d at 322-23 (citations omitted). Cf. Professional Ass'n of College Educators v. El Paso County Community College Dist., 730 F.2d 258, 269 (5th Cir. 1984) ("[T]he court should deny reinstatement in a first amendment wrongful discharge case on the basis of equity only in exceptional circumstances."), cert. denied, 469 U.S. 881 (1984); Banks, 788 F.2d at 1165 (reversing

district court's denial of reinstatement in a § 1983 action where record did "not . . . establish this as one of those 'exceptional cases in which reinstatement is inappropriate'" (quoting Allen, 685 F.2d at 1306)).[9]

With these principles in mind, we turn to examine the factors relied upon by the district court to support its denial of Squires' motion for reinstatement.

**B**

The district court found that the following circumstances supported a denial of reinstatement: (1) "the evidence at trial did not overwhelmingly support Squires' claim of constitutional deprivation"; (2) "[t]here were incidents of poor performance by plaintiff"; (3) plaintiff "would still be required to work at the side of the defendants"; (4) "[r]einstatement would create a delicate balance which could jeopardize required township business which remains the responsibility of the supervisors who, in Pennsylvania, uniquely serve as the executive as well as the legislative branches of government"; (5) this was not "a case where plaintiff has been unable to secure employment"; and (6) reinstatement would "not

---

[9]. Moreover, in § 1983 unconstitutional discharge cases, as in Title VII cases, the district court is required to articulate its reasons when denying reinstatement. See supra n.6.

result in the restoration of seniority or pension benefits."
Squires v. Bonser, et al., No. 92-908 (M.D. Pa. Dec. 14, 1993).

We find that these factors, as developed on the record before us, do not present special circumstances which justify the denial of reinstatement:

The first factor — the district court's assessment that the evidence "did not overwhelmingly support Squires' claim of constitutional deprivation" — is an impermissible factor for the district court to consider. Once the jury has found in favor of plaintiff on liability, the existence of a constitutional deprivation is an established fact which may not be re-examined in the district court's subsequent determinations — including determinations of appropriate equitable remedies. See United States Equal Employment Opportunity Commission v. Century Broadcasting Corp., 957 F.2d 1446 (7th Cir. 1992) ("'[I]n deciding whether to grant equitable relief under Title VII, the district court [is] prohibited from reconsidering any issues necessarily and actually decided by the jury.'" (quoting Hussein v. Oshkosh Motor Truck Co., 816 F.2d 348, 355 (7th Cir. 1987))); cf. Curtis v. Loether, 415 U.S. 189, 196 n. 11 (1974) (where a case encompasses claims for both legal and injunctive relief, "the right to jury trial on the legal claim, including all issues common to both claims, remains intact"); Roebuck v. Drexel University, 852 F.2d 715 (3d Cir. 1988) (the "preeminence of jury verdicts" requires that "the jury's findings on a § 1981 claim .

. . [bind] the trial judge's resolution of a concurrently tried Title VII claim" on issues common to both claims). For the district court to accord weight to its view that the evidence supporting the jury's finding was not "overwhelming" would impermissibly interfere with the province of the jury.[10]

The second factor mentioned by the district court was "incidents of poor performance by plaintiff." Under the Mount Healthy framework applicable to First Amendment unconstitutional discharge cases arising under § 1983, a finding of liability against the employer requires the inference that, absent the unconstitutional conduct, the adverse employment action would not have occurred.[11] Denying reinstatement merely upon a showing of

---

[10]. We note that the jury found the evidence sufficiently strong so as to justify a punitive damages award of $1500. 2 App. at 667. In awarding punitive damages, the jury evidently found, in accordance with the district court's instruction on punitive damages, that the defendants had acted "with malicious intent to violate the plaintiff's Federal rights, or unlawfully to injure him, [or] . . . with a callous or reckless disregard of the plaintiff's rights." Id. at 653–54.

[11]. The distribution of the burden of proof in First Amendment unconstitutional discharge actions was established by the Supreme Court in Mount Healthy City School Dist. v. Doyle, 429 U.S. 274 (1977). Under the Mount Healthy framework, the plaintiff bears the burden of showing that "his conduct was constitutionally protected, and that this conduct was a 'substantial factor'— or, to put it in other words, that it was a 'motivating factor' in the [defendant's] decision not to rehire him." Mount Healthy, 429 U.S. at 287. If plaintiff carries that burden, the employer bears the burden of showing "by a preponderance of the evidence that it would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct." Id. Cf. Bradley v. Pittsburgh Bd. of Education, 913 F.2d 1064, 1074–75 (3d Cir. 1990) (applying Mount Healthy framework).

(..continued)

Given this distribution of the burden of proof, a liability verdict for plaintiff requires the inference that the employer's decision would <u>not</u> have been reached in the absence of the protected conduct. As discussed in <u>Price Waterhouse</u> — in which the Supreme Court applied the <u>Mount Healthy</u> framework to "mixed-motives" cases arising under Title VII — "[a] court that finds for a plaintiff under [the <u>Mount Healthy</u>] standard has effectively concluded that an illegitimate motive was a 'but-for' cause of the employment decision." <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 248 (1989) (plurality opinion). <u>See also</u> <u>id.</u> at 277 (O'Connor, J., concurring) (the "evidentiary scheme [adopted in <u>Price Waterhouse</u>] essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination" (citing <u>Mount Healthy</u> in comparison)).

The jury instructions provided by the district judge, while generally following <u>Mount Healthy</u>, seem to have been somewhat imprecise as to the relative burdens of proof. The district judge first stated that plaintiff had the burden of proving that his speech activities were "a substantial factor or motivating factor" in the decision not to reappoint him as roadmaster. 2 App. at 648. The district judge then stated that if plaintiff carried its burden, defendants had the burden of showing "by a preponderance of the evidence that the plaintiff would have been dismissed or not reappointed in any event." <u>Id.</u> at 650. Finally, the district judge said:

> If the defense meets its burden of proof that plaintiff would have been dismissed or not reappointed in any event, plaintiff must satisfy you by the preponderance of the evidence that the reasons offered by the defense were simply a pretext. And that, indeed, motivation to rid him because of his speech was still a substantial factor in the actions of each defendant.

<u>Id.</u> at 651. This final instruction may be seen as introducing ambiguity into the <u>Mount Healthy</u> formulation: i.e., this instruction may be read as meaning that a verdict could be returned in favor of the plaintiff even if the defendants had proved that they would not have reappointed plaintiff in any case. Appellees have not, however, placed this aspect of the case in focus on appeal. Consequently, appellees are bound to the results which normally flow from a finding of liability under the <u>Mount Healthy</u> framework.

run-of-the-mill incidents of sub-par performance would substantially undercut the goal of providing make-whole relief. Thus, we do not find that such a showing constitutes a special circumstance militating against reinstatement.[12]

The third and fourth factors identified by the district court — that plaintiff "would still be required to work at the side of the defendants" and that "[r]einstatement would create a delicate balance which could jeopardize required township business" — are also not buttressed by findings sufficient to make them permissible considerations. In order to deny reinstatement, more than the ordinary tensions accompanying an unconstitutional discharge lawsuit must be present. "The fact that reinstatement might have 'disturbing consequences,' 'revive old antagonisms,' or 'breed difficult working conditions' usually is not enough 'to outweigh the important first amendment policies that reinstatement serves [absent] probable adverse consequences

---

[12]. Denial of reinstatement may be appropriate in cases involving employee misconduct of a particularly egregious kind, but in the case at bar the district court has made no findings of this sort. See Professional Ass'n of College Educators, 730 F.2d at 268 (harassment of president of the college through anonymous telephone calls may justify decision not to reinstate former dean). Reinstatement may also be denied where after-acquired evidence establishes "wrongdoing . . . of such severity that the employee would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon v. Nashville Banner Publishing Co., 115 S. Ct. 879, 886-87 (1995). It has not been found by the district court or contended here that this case falls under the after-acquired evidence rubric.

[that] weigh so heavily that they counsel the court against imposing this preferred remedy.'" Banks, 788 F.2d at 1165 (quoting Professional Ass'n of College Educators, 730 F.2d at 269); cf. Blum, 829 F.2d at 373-74 (ADEA) ("Unfortunately, reinstatement is not always feasible, e.g., because of irreparable animosity between the parties . . . ."); McKnight v. General Motors Corp., 908 F.2d 104, 116 (7th Cir. 1990) (Title VII) ("Mere hostility by the employer or its supervisory employees is of course no ground for denying reinstatement . . . That would arm the employer to defeat the court's remedial order."), cert. denied, 499 U.S. 919 (1991). Since the district court made no finding that tensions between the parties exceeded those which normally accompany such actions — and, indeed, expressly recited that it did "not . . . conclude that such animosity is irreparable" — these considerations do not justify a denial of reinstatement.[13]

Finally, the fifth and sixth factors identified by the district court — that this was not "a case where plaintiff has been unable to secure employment," inasmuch as "[a]t all times he had his own contracting business, and after his termination, he was employed full time at an ACME market"; and that

---

[13]. As of the time the briefs on appeal were filed, it appeared that Squires was still a member of the Board and Bonser was working roadmaster, see supra n.1., which would seem to mean that a "delicate balance" would exist whether or not Squires were to replace Bonser as working roadmaster.

"[r]einstatement will not result in the restoration of seniority or pension benefits" — do not present special circumstances that cut against reinstatement.  While these factors indicate that front-pay may come closer to providing make-whole relief than it otherwise might, they do not negate the additional psychological and deterrent benefits which reinstatement provides.  Cf. Allen, 685 F.2d at 1306.  Moreover, in considering that, after losing his township position, the plaintiff was able to find alternative employment, the district court failed to give adequate consideration to the comparability of that new employment.  We do not believe that the fact that Squires was able to get a job in the produce section at an ACME market militates against granting him reinstatement as the township's working roadmaster.

In sum, we conclude that denial of reinstatement for the reasons assigned by the district court was not a proper exercise of that court's equitable discretion.[14]

---

[14]. Appellees cite an additional factor, not discussed by the district court, in support of denying reinstatement.  Appellees argue that it would be inappropriate for Squires to be reinstated because the position of working roadmaster is a one-year appointment.  Since the decision challenged by Squires was the non-reappointment of Squires in 1992, appellees contend that an order for reinstatement at this time would "interfere with the statutory scheme for appointing roadmasters."  Appellees' Br. at 21.  We agree that ordering reinstatement does, in some measure, intrude upon the statutory scheme.  But the jury, through its verdict in Squires' favor, has determined that defendants have skewed the statutory scheme by infringing upon Squires' First Amendment rights.  Reinstatement comes into play as a make-whole remedy vindicating those rights and thereby restoring the constitutional integrity of the statutory scheme.

**III**

Appellees have offered a further reason why reinstatement was properly denied. Appellees contend that, because reinstatement and front-pay are alternative forms of relief, and because Squires was awarded front-pay damages by the jury, relief in the form of reinstatement is barred.

We disagree. It is true that if front-pay was awarded, a grant of reinstatement would raise concerns regarding double recovery. Such concerns could be alleviated by an order vacating any front-pay award; however, it may not be possible in this case to isolate the front-pay award since the jury awarded a lump-sum amount for compensatory damages.[15] But this does not foreclose reinstatement; rather, it means that the issue of double recovery should be resolved by a new trial on compensatory damages. Cf. Savarese v. Agriss, 883 F.2d 1194, 1205-06 (3d Cir. 1989) (remanding for a new trial on compensatory damages where there may have been overlap between backpay award determined by the

_____

[15]. Question Three of the verdict form, to which the jury responded with the lump-sum award of $37,100, read: "What compensatory damages, if any, did the plaintiff suffer?" 2 App. at 667. In instructing the jury regarding the components of the damages award, the district judge stated that "[p]laintiff is entitled to be compensated for any wages that you find that he lost up to this date, or any wages that you find that he may lose in the future." Id. at 651.

district judge and compensatory damages award determined by the jury); <u>Greminger v. Seaborne</u>, 584 F.2d 275, 278-79 (8th Cir. 1978) (remanding for redetermination of monetary award where there may have been overlap between backpay award and compensatory damages award). Therefore, the fact that the jury was instructed on front-pay does not preclude a judicial determination that equitable relief in the form of reinstatement is called for.[16]

## IV

In sum, the factors enumerated by the district court do not present special circumstances justifying the denial of reinstatement. Further, reinstatement is not precluded by the fact that the jury may have included front-pay in its damages award. Accordingly, we will vacate the district court's order denying reinstatement and remand the case for entry of an order of reinstatement and for a new trial on compensatory damages.

---

[16]. However, we discourage the practice of asking the jury for a lump-sum award which includes front-pay when the plaintiff also seeks reinstatement. Such a procedure wastes judicial resources in that if reinstatement is awarded a retrial is then required to parcel out the damages into component parts (i.e., front-pay versus back-pay). Accordingly, we believe the preferable course for a plaintiff seeking the equitable remedy of reinstatement is for such a plaintiff to ask for a jury interrogatory concerning the amount of damages attributable to front-pay in order to avoid a double recovery. In the future, we may require such a practice in order to preserve a claim for reinstatement.