Irene FACHA

v.

Henry G. CISNEROS, Secretary, U.S. Department of Housing and Urban Development.

Civil Action No. 95–785.

United States District Court, E.D. Pennsylvania.

Feb. 1, 1996.

Order Amending Memorandum on Grant of Reconsideration in Part March 6, 1996.

---

Clifford A. Boardman, Philadelphia, PA, for plaintiff.

Irene Dowdy, Special Attorney, United States Department of Justice, Trenton, NJ, for defendant.

### MEMORANDUM

DALZELL, District Judge.

I. *Introduction*

Plaintiff, Irene H. Facha, believes that officials in the Department of Housing and Urban Development engaged in (1) reprisal for her union activity (the "reprisal claim"), (2) sex discrimination (the "sex discrimination claim"), and (3) retaliation for her prior EEO activity (the "retaliation claim").

Facha sought redress for the reprisal claim by filing a grievance pursuant to her collective bargaining agreement (the "grievance"). She raised her sex discrimination and retaliation claims in a complaint with the

Equal Employment Opportunity Commission (the "EEO Complaint"). Facha, however, labors under a collective bargaining agreement that would have allowed her to raise her sex discrimination and retaliation claims in the grievance. Thus, under 5 U.S.C. § 7121(d) and its implementing regulations, to the extent that Facha raised the same "matter" (a word, as will be seen, of considerable confusion) in both her grievance and her complaint, her election of the grievance route bars her subsequent EEO complaint.

This case presents difficult questions of law and fact, and we will therefore rehearse our conclusions at the outset.

With respect to our analysis under 5 U.S.C. § 7121(d), we hold that Facha made an irrevocable election on November 20, 1992, when she chose to raise certain employment matters in a grievance pursuant to her collective bargaining agreement. Her choice bars her from pursuing those same matters in the EEO complaint that she filed on December 18, 1992, even though she did not specifically raise claims of sex discrimination and retaliation in the grievance. Simply put, the law prohibits Facha from raising any *matter* in her EEO claim that she had raised earlier in her grievance, regardless of the legal *claims* in those two documents.

We also hold, however, that Facha raised three discrete matters for the first time in her EEO complaint. With respect to these topics, her EEO complaint reaches more broadly than her grievance, and the grievance did not bar these matters. After discovery, however, Facha has not shown that any of the non-barred matters occurred within the 45-day window of 29 C.F.R. § 1614.105.

Finally, we hold that Facha's 1994 EEO complaint cannot salvage her defective and untimely 1992 EEO complaint, and that no equitable factors apply to her action. Thus, treating the Government's motion for summary judgment as a motion to dismiss for lack of jurisdiction over the subject matter, we will dismiss this action.

## II. *Factual Background*

On October 26, 1992, Irene Facha received a performance evaluation for her work as a senior trial attorney with the Department of Housing and Urban Development ("HUD"). Def.'s resp. ex. 12. Although Facha garnered a "Fully Successful" rating for the year ending September 30, 1992, she nevertheless perceived invidious motives in the rating. On November 20, 1992, she filed a grievance pursuant to her collective bargaining agreement. In a nine-page attachment to the grievance, she argued that her superiors had punished her as reprisal for union activity. *Id.* ex. 7 (attachment entitled "Grievance of Rating/Unfair Labor Practices"). Moreover, Facha's grievance decried not just her performance rating but a full range of alleged attacks, lies, snubs, and slights. She argued that all of this conduct (which we describe below) constituted unfair labor practices.

Facha's collective bargaining agreement would have permitted her to argue that the matters that she considered grounds for her reprisal claim also constituted sex discrimination, or retaliation for prior EEO activity.[1] Def.'s May 12, 1995 mot. to dismiss (docket no. 3) ex. 2A (section 22.03 of the collective bargaining agreement). The agreement specifically warned, "In accordance with Section 7121(d) of the [Civil Service Reform Act], an aggrieved employee affected by a prohibited personnel practice under Section 2302([b])(1) ... may raise the matter under a statutory procedure or the grievance procedure, but not both." *Id.* It is undisputed that Facha only argued that the "matters" raised in her grievance constituted an unfair labor practice. She did not argue that her superiors' conduct constituted sex discrimination or reprisal for prior EEO activity.[2]

Notwithstanding the warning of her collective bargaining agreement or the warnings

---

1. Facha had settled a prior EEO complaint in 1988 or 1989. Part of the settlement terms allowed her to transfer from Washington, D.C., to the HUD's regional office in Philadelphia. Pl.'s resp. at 2.

2. Facha ultimately withdrew her grievance in September, 1993, after it had passed through three preliminary stages but before binding arbitration.

she had received from an EEO counselor,[3] on December 18, 1992 Facha filed a formal EEO complaint alleging discrimination on these two grounds. In her sex discrimination claim, Facha argued that HUD gave men better performance ratings than women for reasons unrelated to the quality of their work. Def.'s mot. ex. 1. She also claimed that HUD fostered a hostile work environment for women. *Id.* In her retaliation claims, she alleged that, as a result of her prior EEO activity, HUD (1) refused to allow her to "act for" her supervisors in their absence; (2) refused to give her assistance with her caseload; (3) reassigned her cases to other attorneys; (4) gave her harsher performance ratings than other workers, even though her caseload was more onerous than theirs; and (5) treated her differently than others in her need to travel and accumulate continuing legal education credits. *Id.* As in her grievance, Facha's EEO complaint encompassed a broad range of conduct, covering many different subjects. All but three of the topics underlying these claims were reiterations of Facha's grievance.

On September 8, 1994, Mari Barr, the Acting Director of Equal Employment Opportunity at HUD, dismissed Facha's EEO complaint, relying on 29 C.F.R. § 1614.107(d). Def.'s 5/12/95 mot. to dismiss ex. 1b. This regulation instructs the agency to dismiss a complaint "[w]here the complainant has raised [a] matter in a negotiated grievance procedure that permits allegations of discrimination". 29 C.F.R. § 1614.107(d). This action followed.

In May, 1995, the Government moved to dismiss Facha's complaint. *See Facha v. Cisneros,* No. 95–785 (May 12, 1995) (docket entry 3). In July, we denied the motion and held that Facha's EEO complaint survived the Government's motion to dismiss because its underlying facts reached more broadly than her grievance. Order, *Facha v. Cisne-*

ros, No. 95–785 (July 5, 1995) (docket entry 5). We instructed the parties to commence discovery, and we invited the Government to renew its motion on summary judgment. We declined to address Facha's argument that her 1994 EEO complaint cured any defect in her 1992 EEO complaint.

Discovery has ended, and the Government has now moved for summary judgment.

### III. *Legal Standard*

▮▮▮ We will treat the Government's motion as a motion to dismiss for lack of subject-matter jurisdiction rather than for summary judgment. The distinction is important, for two reasons. First, a grant of summary judgment is a judgment on the merits of a case, but a jurisdictional inquiry in not related to the merits. *Kulick v. Pocono Downs Racing Ass'n, Inc.,* 816 F.2d 895, 898 n. 6 (3d Cir.1987). Moreover, Facha bears the burden of proving that this Court has subject-matter jurisdiction over her complaint. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied.,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Of course, the jurisdictional inquiry is by no means a threshold inquiry, as our Court of Appeals has recently shown by dismissing a complaint for lack of jurisdiction on appeal after a full trial on the merits. *See, e.g., Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 198 (3d Cir.1995).

We may therefore consider the Government's motion at this late date.[4] *See also* Fed.R.Civ.P. 12(h)(3).

### IV. *Legal Analysis*

The Government's motion raises four distinct inquiries. First, what effect did Facha's November, 1992 grievance have on her December, 1992 EEO complaint? This is a

---

3. Facha filed her EEO complaint despite having received, and signed, a "Notice of Rights and Responsibilities of Counseled Individuals" from her EEO counselor on October 29, 1992. This document also warned, "Where the department's collective bargaining agreement (CBA) and the EEO laws cover the alleged discrimination, you must elect to either file an EEO complaint through the Department's internal EEO process or file a grievance under the CBA, but not both." Def.'s May 12, 1995 mot. to dismiss ex. 1a (paragraph 3). Paragraph 4 addressed the "election requirement in the event the matter at issue is

appealable to the Merit Systems Protection Board, i.e., the matter is a mixed case". This paragraph warned, "You may *not* file both a MSPB appeal and an EEO complaint on the same matter. The process selected first is deemed the elected process." *Id.* (emphasis in original).

4. Moreover, since our Order of July 5, 1995 invited the Government to make the very motion it has now made, Facha cannot claim lack of fair notice.

true jurisdictional inquiry. Second, of the "matters" that Facha raised in her EEO complaint but not in her grievance, has Facha satisfied the timeliness requirement of 29 C.F.R. 1614.105? Third, did Facha's 1994 EEO complaint cure the defects of her 1992 EEO complaint? Although these second and third inquiries are not truly jurisdictional, *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) (holding that the administrative time requirements of Title VII are not jurisdictional but are subject to the equitable considerations of estoppel, waiver, and laches), they do bear on our power to entertain Facha's complaint. Finally, we examine whether the comments of a HUD official warrant application of the equitable principle of estoppel.

A. *The First Inquiry: 5 U.S.C. § 7121(d)*

1. *Statutory and Regulatory Framework*

We begin with the policies underlying the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. No. 95–454, 92 Stat. 1111 (codified in scattered sections of, *inter alia*, 5 U.S.C.). In passing the CSRA, Congress hoped to increase the efficiency of the federal government by allowing collective bargaining in the federal workplace. *Cornelius v. Nutt*, 472 U.S. 648, 666, 105 S.Ct. 2882, 2892, 86 L.Ed.2d 515 (1985) (Marshall, J., dissenting); *see also* 5 U.S.C. § 7101(a) (describing the findings and purpose of the Act). The CSRA is unquestionably a worker-friendly statute, allowing union representatives of federal employees to bargain for the terms and conditions of workers' employment. *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 107, 104 S.Ct. 439, 449, 78 L.Ed.2d 195 (1983). The resulting collective bargaining agreement "shall provide procedures for the settlement of grievances", and "the[se] procedures shall be the exclusive procedures for resolving

grievances which fall within its coverage." 5 U.S.C. § 7121(a)(1); *see also Cornelius*, 472 U.S. at 666, 105 S.Ct. at 2892 (citing 5 U.S.C. § 7106).

Congress also recognized that the CSRA's intricate scheme would break down if the federal judiciary began tinkering with it. The CSRA provides judicial review, if at all, only at certain steps in the process, and lower courts have heeded the Supreme Court's admonitions to "leave the architecture of the federal personnel system to Congress". *Carter v. Gibbs*, 909 F.2d 1452, 1456 (Fed.Cir.) (citing *Volk v. Hobson*, 866 F.2d 1398, 1403 (Fed.Cir.1989)), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). *Carter*, for example, points to the Supreme Court's refusal to expand the scope of judicial review beyond the CSRA's provisions. *Id.* at 1455–56 (citing cases). In some cases judicial review of an adverse employment action is simply unavailable, and the parties must accept binding arbitration. In other cases, judicial review must await review by the Merit Systems Protection Board ("MSPB"). *See American Federation of Government Employees Local 2052 v. Reno*, 992 F.2d 331 (D.C.Cir.1993) (describing the various procedures under the CSRA).

5 U.S.C. § 7121(d) deals with a special subcategory of "mixed" employee grievances, to wit, that a job action constituted both an unfair labor practice and unlawful discrimination.[5] Such cases are tricky, because the EEOC normally has jurisdiction over discrimination cases, and an aggrieved employee must normally pursue the elaborate procedures set out in Title VII.[6] The EEOC, however, has no jurisdiction over labor grievances generally (*i.e.*, job disputes not involving claims of discrimination), nor is the grievance procedure the traditional route for the resolution of claims of discrimination. Congress

---

**5.** A "mixed case" is a matter over which the MSPB could have jurisdiction but which also raises issues of employment discrimination. *Vinieratos v. United States*, 939 F.2d 762, 766 n. 2 (9th Cir.1991) ("It is a case that involves a challenge to a managerial decision that is appealable to the MSPB as well as a claim of employment discrimination.") (citing 29 C.F.R. § 1613.402(a)); *see also American Federation of Government Employees Local 2052*, 992 F.2d at 332. Here, Facha's case did not present a true

"mixed case" because the job action that HUD took against her was not sufficiently serious, *see* 5 U.S.C. § 7512, to trigger review by the Merit Systems Protection Board, *see id.* § 7702. Thus, we use the term "mixed" in a slightly different sense than in *Vinieratos* and *American Federation of Government Employees Local 2052*.

**6.** The CSRA counterpart to Title VII is 5 U.S.C. § 2302(b)(1), which, in essence, imports the anti-

therefore faced a difficult dilemma. It could ask the federal employee to resolve her case either through the grievance process (a course that would preserve the importance of the collective bargaining agreement in the CSRA regime but require the federal employee to waive her discrimination claim) or through the EEOC process (a course that not only would diminish the importance of the collective bargaining agreement but also would require the federal employee to waive all claims other than her discrimination claim).

■ Congress resolved this dilemma in 5 U.S.C. § 7121(d), which creates an exception to the exclusivity provision of § 7121(a)(1):

(d) An aggrieved employee affected by a *prohibited personnel practice under section 2302(b)(1) of this title* which also falls under the coverage of the negotiated grievance procedure may raise *the matter* under a statutory procedure or the negotiated procedure, *but not both*. An employee shall be deemed to have exercised his option under this subsection to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, *whichever event occurs first....*

5 U.S.C. § 7121(d) (emphasis added).[7] If a federal employee works pursuant to a collective bargaining agreement that permits her to raise Title VII-type discrimination claims in a grievance under that agreement, and if that employee believes that she is the victim of discrimination, § 7121(d) requires her to make an election to pursue her "matter" through either the statutory procedure or the negotiated grievance procedure, "but not both". *Vinieratos*, 939 F.2d at 768–68; *Smith v. Kaldor*, 869 F.2d 999, 1005 (6th Cir.1989); *see also American Federation of Government Employees Local 2052*, 992 F.2d at 332–33 (describing the procedural steps

under both approaches). An employee's election is irrevocable, *Vinieratos*, 939 F.2d at 768, and occurs on the first filing of either an EEO complaint or a grievance, *id.* at 769; *see also Jones v. Department of Health and Human Servs.*, 622 F.Supp. 829, 830 (N.D.Ill. 1985).

■ Congress's use of the word *matter* in § 7121(d) renders irrelevant the legal status of the act complained of. In *Bonner v. Merit Systems Protection Bd.*, 781 F.2d 202, 204–05 (Fed.Cir.1986), the Federal Circuit examined the legislative history of the Civil Service Reform Act to determine the definition of "matter", and held that the word referred to the "underlying [employment] action" at issue in a employee's dispute with his employer. *Id.* at 205; *Macy v. Dalton*, 853 F.Supp. 350, 353 (E.D.Cal.1994). 29 C.F.R. § 1613.219(b) confirms this interpretation. That regulation instructs:

An aggrieved employee who files a grievance in writing with an agency whose negotiated agreement with an employee organization permits the acceptance of grievance[s] which allege discrimination prohibited by this subpart, may not thereafter file a complaint on the same matter under the provisions of this subpart *irrespective of whether the grievance has raised an allegation of discrimination within the negotiated grievance procedure.*

29 C.F.R. § 1613.219(b) (emphasis added). Thus, the inquiry into whether a federal employee has impermissibly attempted to proceed in two fora must focus on the "matter" that the employee raised (and the forum in which she first raised that matter), not on legal jargon.

■ We have had considerable difficulty determining the "matters" that Facha placed in issue when she filed her nine-page grievance on November 20, 1992. Too narrow a definition of "matter" would frustrate the election provisions of § 7121(d). This in turn would undermine the CSRA's reliance on collective bargaining agreements, since clever drafting could then allow an employee to

discrimination laws of Title VII into federal employees' workplaces.

**7.** "Personnel action[s]" include, *inter alia*, appointments, promotions, transfers, and performance evaluations. 5 U.S.C. § 2302(a)(2).

"Prohibited personnel practice[s]" include, *inter alia*, the panoply of rights protected under Title VII, the Age Discrimination in Employment Act, the Fair Labor Standards Act, and the Rehabilitation Act. *Id.* § 2302(b)(1).

proceed both in a grievance and in an EEO complaint. Too broad a definition of "matter" would create a trap for the unwary grievant.

In resolving this issue we have relied on practical necessity. We have laid Facha's grievance side-by-side with her EEO complaint and have compared the two documents. Our inquiry is straightforward: If Facha raised a topic in both documents, or if the arbitrators assigned to handle the grievance would necessarily have needed to inquire into a topic in discharging their duties, then § 7121(d) bars her from raising that same topic in her subsequent EEO complaint.

 As will be seen, Facha raised many topics in both documents, and § 7121(d) bars these. We hold that Facha's EEO complaint contains only three topics not raised in her grievance, to wit, (1) comments that created a sexually-charged hostile environment, (2) the denial of acting opportunities, and (3) disputes over training and continuing legal education.

### 2. *A Comparison of Facha's Grievance and EEO Complaint*

#### a. Performance Ratings

| EEO Complaint | Grievance |
|---|---|
| "Upon receiving my performance appraisal this year, I informed Ms. Harrison of my intent to file a grievance. She responded by saying I should do what I thought was necessary but that she had to 'stretch to give me even that given my senior GS–14 status. ....'" (¶ 32; see also ¶¶ 14–19) | "[U]pon receiving my rating, I informed you that I would have to file a grievance. You responded that I should do whatever I thought necessary but that you 'had to stretch to give me even that much—given that I am a senior GS–14.'" (p. 2) |

#### b. Hostile Work Environment

| EEO Complaint | Grievance |
|---|---|
| "Overall, the office has harassed and made the work environment difficult for women." (¶ 20; see also ¶¶ 21–23) | [None, except to the extent that the claim of hostile work environment depends upon reassignment of cases and provision of assistance, which we describe below.] |

Paragraph 21 of Facha's EEO complaint describes two incidents in which Facha's superiors allegedly made derogatory comments to two female office workers regarding their sex. Paragraphs 22 and 23 describe comments disparaging Facha's work performance, but these comments are not explicitly sexual in nature. The arbitrators assigned to resolve Facha's grievance would have no need to verify whether the explicitly sex-based comments occurred. They would, however, need to determine the truth of the comments concerning Facha's work performance. Thus, the grievance bars the latter comments, but not the former.

#### c. Denial of "Acting Opportunities"

| EEO Complaint | Grievance |
|---|---|
| "We are presumed incapable of handling the responsibility without being provided the opportunity to succeed or fail on our own merit. Even though I acted for Ann on two occasions without complaint, I was in essence 'demoted' in the acting list." (¶ 28; see also ¶¶ 25–27) | [None.] |

#### d. Assistance on cases

| EEO Complaint | Grievance |
|---|---|
| "I have never had anyone assigned to assist me during my four years on staff with respect to any of my cases. However, Paul Feiner was assigned Emma Oh to assist him on his multifamily bankruptcy/affirmative litigation case—Blumenfeld. Ms. Swain was assigned three temporary employees, then two regular employees to conduct single family foreclosures. Ms. Keegan was personally assisted by both Ms. Harrison and Mr. Campanella with respect to her duties regarding the Philadelphia Housing Authority." (¶ 29; see also ¶ 31) | "Given ... your prior history of not designating anyone on the staff to assist me in handling the multimillion dollar cases for which I was responsible, ... I had agreed to come in on my days off if provided compensatory time to complete my assignments." (p. 7) "You ... frequently assign ... staff [to other attorneys] to assist them in the accomplishment of their work. However, only I am rated fully successful for having those same needs during a busy period in my work." (p. 8) |

#### e. Criticism of Work Performance

| EEO Complaint | Grievance |
|---|---|
| "I was informed that 'the facts were in my favor' by Ms. Harrison as an explanation for my record of not losing a case." (¶ 22) "While managers and program staff praise what I have helped them accomplish, I am treated derisively by my superiors." (¶ 31) | "You went on to state that I had mishandled the 'Dorsey case'.... [I]n your attempts to find something wrong with my performance, since I haven't lost a case, you are stretching beyond reasonable limits." (p. 2) |

We recognize that no precise correlation exists between the work-performance claims that Facha raised in both documents. The

arbitrators assigned to handle Facha's grievance, however, would necessarily have needed to inquire into the quality of Facha's work performance and, in turn, whether her superiors' criticisms were *bona fide* or not. Thus, we conclude that Facha's grievance bars her from raising criticisms of her work performance in her EEO complaint.[8]

#### f. Training

| EEO Complaint | Grievance |
| --- | --- |
| "I have often been permitted to attend [CLE] training, which is approved as related to may job, only if I pay my own travel expense. In addition, there have been infrequent disputes over whether training given locally was sufficiently job related." (¶ 33) | [None.] |

#### g. Reassignment of Cases

| EEO Complaint | Grievance |
| --- | --- |
| "Until July of 1992, I have never had a case reassigned to another attorney in the office. However, I have received several cases reassigned from Ms. Swain, Ms. Keegan, Ms. Donahue, and Mr. Feiner. One of the cases I had was reassigned to the original attorney handling the matter—Ms. Keegan. My two hospital bankruptcies were reassigned to Mr. Feiner when Ms. Harrison became upset over my request for compensatory time." (¶ 30) | "[Y]ou transferred the two hospital cases to Paul Feiner and did not assign me anymore cases appropriate to my grade level for the balance of the rating period. This is the first time you have ever reassigned my cases to another attorney. However, I have frequently handled the reassigned cases of other members of the staff." (p. 2) |

Finally, Facha can claim no surprise at the position that HUD has taken with respect to her EEO complaint. Indeed, the first five pages of that complaint urge the propriety of proceeding in both fora. *See* def.'s mot. ex.

---

8. Assume, for example, that Facha believed that ten comments regarding her work performance constituted both the reprisal and discrimination elements of her mixed case. Assume also that these ten comments were purely related to Facha's work (and were not, *e.g.*, explicit comments about her sex or about her union activity). Surely the CSRA would not allow her to challenge five of those comments in a grievance and five in an EEO complaint. Simply put, when Facha challenged her superiors' criticism of her work in her grievance, she put that "matter" in issue, and she could not thereafter raise criticism of her work in the EEO complaint.

9. The regulation instructs:
Aggrieved persons who believe they have been discriminated against on the basis of race, col-

1. Thus, as early as 1992 Facha knew that serious questions existed regarding her view of the law. Facha's experiences as a HUD senior trial attorney (as she describes them in her grievance and EEO complaint) confirm that she understands the nuances of complicated litigation. We do her no disservice by taking account of her legal acumen in resolving this motion, since her belief that HUD failed to take her skills seriously forms the basis of her grievance and her EEO complaint.

\* \* \*

### B. *The Second Inquiry: 29 C.F.R. § 1614.105*

As we have seen above, Facha's EEO complaint survives her grievance only with respect to her claims of (1) sexually-charged hostile work environment, (2) denial of "acting for" opportunities, and (3) denial of training opportunities.

Nevertheless, under 29 C.F.R. § 1614.105(a)(1), a federal employee must report incidents of discrimination to an EEO counselor within 45 days of the allegedly discriminatory event.[9] Thus, to proceed in the three areas, Facha must show that at least one discriminatory event occurred within the 45–day period.[10]

In her response to the Government's motion, Facha points to eleven "specific acts" of discrimination that occurred in the 45 days prior to October 26, 1992:

(1) Plaintiff received an unfair written performance review for her work in 1992; Plaintiff was subject to the following acts

---

or, religion, sex, national origin, age or handicap . . . must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

29 C.F.R. § 1614.105(a)(1).

10. For the purposes of this motion we shall not address whether two comments, not directed at Facha, would provide a basis for her hostile work environment claim. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). We simply note that these two events could not have occurred within the 45–day window. *See* Mem. in support of def.'s mot. at 17.

of hostility, (2) her supervisor told her she had to stretch to give her a fully satisfactory for her work in 1992, (3) her supervisor accused her unjustly of making a mistake on the Bradley Manor case, (4) her supervisor unfairly refused to extend a deadline on a project, and (5–9) her supervisor criticized Plaintiff unfairly on five separate occasions of problems in Plaintiff's legal writing; (10) Plaintiff was denied funding for travel to a Washington, D.C. seminar; and (11) Plaintiff was denied compensation time for time spent at a seminar in Washington, D.C. on her day off.

Pl.'s resp. at 5. None of these events, however, suffices to establish a discriminatory act within the 45–day period. Numbers (1), (2), (3), (5–9), and (11) form part of Facha's grievance, and therefore § 7121(d) bars her from raising those acts as part of her EEO complaint. In a meticulous inquiry into the record of this action, the Government has also shown, persuasively, that neither (4) nor (10) could have occurred within the 45 days prior to October 26, 1992, the day she initiated contact with an EEO counselor.[11] *See* Mem. in support of def.'s mot. at 15–34. Nor could the sexually-charged comments or the denial of acting opportunities have occurred during that window. *Id.* at 17, 21–24.

### C. *The Third Inquiry: Waiters v. Parsons, 729 F.2d 233 (1984)*

 In 1994, Facha filed a second EEO complaint. In this complaint, Facha alleges that her superiors at HUD denied her "acting for" and training opportunities in 1994. She now argues that her 1994 EEO complaint confers jurisdiction on us to consider her 1992 complaint. Pl.'s resp. at 1 (arguing

that her 1994 EEO complaint "serves as a basis for this lawsuit").

In *Waiters v. Parsons,* 729 F.2d 233 (3d Cir.1984), our Court of Appeals held that an employee need not file a EEO complaint for perceived discrimination as long as (1) the employee has a then-pending outstanding EEO complaint, and (2) the subsequent discrimination relates to the act in the original EEO complaint. *Id.* at 237. "Where discriminatory actions continue after the filing of an EEOC complaint, ... the purposes of the statutory scheme are not furthered by requiring the victim to file additional EEOC complaints and re-starting the 180 day waiting period." *Id.; see also Turner v. Orr,* 804 F.2d 1223, 1226–27 (11th Cir.1986).

Facha' reliance on *Waiters* is fruitless. The *Waiters* rule, and the cases that rely on it,[12] *presume* an EEO complaint that is timely and free of other defect. In such cases, a complainant need not adhere to the administrative rules for subsequent, related events. As we have held above, however, Facha's 1992 EEO complaint was almost entirely defective because of her choice to file a grievance, and her consequent failure to adhere to § 7121(d). To the limited extent that the complaint survived the grievance, it was untimely.

 Facha has offered no support for the proposition that a second EEO complaint can cure an earlier, defective EEO complaint, nor have we found any support in our own research.[13] Although the time limits of Title VII's administrative procedures are not jurisdictional, *Zipes,* 455 U.S. at 393, 102 S.Ct. at 1132, those procedures have not yet dissolved entirely. Moreover, because of the special policy concerns underlying the CSRA, and

---

**11.** In *West v. Philadelphia Electric Co.,* 45 F.3d 744 (3d Cir.1995), our Court of Appeals held that discriminatory conduct outside of the relevant time period (here, 45 days) can form a basis for suit as long as (1) at least one act occurred within the relevant time period, and (2) all the conduct forms a "continuing violation". The "continuing violation" cases cannot help Facha, however, because no discriminatory act occurred within the 45 days prior to October 26, 1992.

**12.** *See, e.g., Loe v. Heckler,* 768 F.2d 409, 420 (D.C.Cir.1985); *Clark v. Commonwealth of Pennsylvania,* 885 F.Supp. 694, 711 (E.D.Pa.1995);

*EEOC v. MCI International, Inc.,* 829 F.Supp. 1438, 1482 (D.N.J.1993); *Sandom v. Travelers Mortgage Servs. Inc.,* 752 F.Supp. 1240, 1246 (D.N.J.1990) (citing cases).

**13.** Of course, if Facha had chosen to bring suit in federal court after the dismissal of her 1994 EEO complaint, then, under a continuing violation theory, some of the facts of her 1992 EEO complaint might have been relevant to the disposition of that claim. We offer no opinion in that regard, but only note that Facha has based this federal court action *only* on her 1992 EEO complaint. *See* complaint ¶ 7.

Facha's position as a senior trial attorney, we are especially hesitant to carve out a special niche for her action.

### D. The Fourth Inquiry: Facha's "Agreement" with Frank D. Wing, Jr.

In her response to the Government's motion, Facha implies (but does not explicitly state) that she withdrew her grievance because of an "agreement" that she had with a HUD official:

> Defendant personally agreed with me through his special assistant, Frank D. Wing, Jr., that if I withdrew my grievance over the 1992 Performance Review, he would look into the appropriateness of that rating. Mr. Wing and I also agreed that the grievance withdrawal was in no way to affect the progress of my EEO Charge, including the investigation of discriminatory bias in the creation of the 1992 Performance Review.

Pl.'s resp. ex. B (Facha aff. ¶ 8). Facha's clear implication is that we should conclude that Wing's conduct warrants application of the principles of waiver or estoppel. This argument is misplaced, however, for at least three reasons.

First, we can discern nothing misleading in Wing's statements, even if he made them. He said only that he would "look into" Facha's rating, but he did not promise that he would change that rating. Nor was it misleading for Wing to "agree[ ] that the grievance withdrawal w[ould] in no way ... affect the progress of [Facha's] EEO Charge". Facha's EEO charge has foundered on her own conduct and on the neutral operation of existing statutory and administrative law, not on the conduct of anyone at HUD. Wing's

conduct simply could not have "affect[ed] the progress" of her EEO complaint, and the position Facha now occupies is of her own making. *See, e.g., Heckler v. Community Health Services,* 467 U.S. 51, 59–61, 104 S.Ct. 2218, 2223–25, 81 L.Ed.2d 42 (1984) (describing the elements of estoppel and its application against the Government).[13]

Second, Facha has *never* argued that she wishes to reactivate her grievance. Instead, she wishes to proceed with her 1992 EEO complaint. Even if we concluded that Wing had misled Facha, we could not grant her a remedy against the EEOC. Simply put, we could not invoke the principle of estoppel against the *EEOC* for conduct of Wing, a *HUD* official. *See Office of Personnel Management v. Richmond,* 496 U.S. 414, 419–20, 110 S.Ct. 2465, 2468–69, 110 L.Ed.2d 387 (1990) (canvassing past estoppel decisions involving the Government, and noting the conduct of an official cannot estop the Government where, *inter alia,* (1) no statutory authority existed for the relief sought, or (2) the official acted outside the bounds of his authority).

Finally, whatever his other duties and responsibilities may be, Wing surely does not have the power to waive the complicated statutory and regulatory scheme of the CSRA. For these reasons, and in the absence of a stronger showing that Wing actively misled Facha, we hold that her affidavit cannot resuscitate her 1992 EEO complaint.

### V. Conclusion

There is no question that § 7121(d) applied to Facha's dispute with HUD. Her collective

---

**13.** *Heckler* suggests that estoppel will not normally lie against the Government. *Heckler,* 467 U.S. at 60, 104 S.Ct. at 2224 ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant."). This is especially true for oral statements:

> The appropriateness of respondent's reliance is further undermined because the advice it received ... was oral. It is not merely the possibility of fraud that undermines our confidence in the reliability of official action that is not confirmed or evidenced by a written instrument. Written advice, like a written judicial opinion, requires its author to reflect about the nature of the advice that is given to the citizen, and subjects that advice to the possibility of review, criticism, and reexamination.

*Id.* at 65, 104 S.Ct. at 2227. Here, to the extent that Facha actually relied on Wing's statements (a question she does not address), her reliance is unreasonable. She is undoubtedly a sophisticated lawyer, and she knew of the complicated statutory and administrative framework that she was encountering. The first five pages of her EEO complaint argue the propriety of proceeding both by grievance and by EEO complaint. *See* def.'s mot. ex. 1. It would be unreasonable for her to believe that a single government agent had the power to alter this framework by mere oral agreement. *Heckler,* 467 U.S. at 60, 104 S.Ct. at 2224 ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.").

 

bargaining agreement allowed her to file a grievance regarding perceived sex discrimination. Facha, therefore, could have filed either a grievance or an EEO complaint, "but not both." She made her irrevocable election on November 20, 1992, when she filed a grievance. As in *Vinieratos*, "Abandonment of that process in order to pursue another avenue of relief constituted a failure to exhaust the one appropriate administrative remedy [s]he had selected." *Vinieratos*, 939 F.2d at 769.

Moreover, to the extent that Facha's EEO complaint reaches more broadly than her grievance, it is untimely. Nor can her 1994 EEO complaint create jurisdiction over her defective 1992 EEO complaint. Facha, a HUD senior trial attorney, deprived this Court of jurisdiction through her choice of the grievance route, and through the matters she chose to raise in that grievance.

An appropriate Order follows.

### ORDER

AND NOW, this 1st day of February, 1996, upon consideration of defendant's motion for summary judgment, and the response and reply thereto, and the Court treating the motion as one to dismiss for lack of jurisdiction over the subject matter, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. This case is DISMISSED for lack of subject matter jurisdiction over the subject matter;

3. Defendant's second motion for extension of time due to Government furlough (docket no. 40) is DENIED AS MOOT; and

4. The Clerk shall CLOSE this case statistically.

### ORDER

AND NOW, this 6th day of March, 1996, upon consideration of plaintiff's motion for reconsideration and the response of defendant thereto, and the Court finding that any error in our Memorandum of February 1, 1996 was harmless,[14] it is hereby ORDERED that:

1. Plaintiff's motion for reconsideration is GRANTED IN PART and DENIED IN PART;

2. Our Memorandum dated February 1, 1996 is AMENDED as follows:

[Editors Note: Correction incorporated for publication purposes.]

3. The Memorandum of February 1, 1996, as amended by these changes, is attached, and SUPERSEDES the former Memorandum; and

4. In all other respects, the motion is DENIED.

---

**14.** In her motion, Facha argues that her case did not present a "mixed case" because the job action that HUD took against her was not sufficiently serious, *see* 5 U.S.C. § 7512, to trigger review by the Merit Systems Protection Board, *see id.* § 7702. Defendant agrees with this contention, but correctly notes that this error is not relevant to the result, since § 7121(d) indisputably applies to Facha's case. Thus, any error in our Memorandum was semantic and, therefore, harmless.