**Preston JAMES, Plaintiff,**

v.

**Gale NORTON, Defendant.**

**No. CIV.A. 99–2548.**

United States District Court, E.D. Pennsylvania.

Nov. 30, 2001.

Olubenga O. Abiona, Philadelphia, PA, for Plaintiff.

James G. Sheehan, U.S. Attorney's Office, Philadelphia, PA, for Defendant.

## *OPINION*

SCHILLER, District Judge.

On May 18, 1999, Preston James filed an employment discrimination suit against then-Secretary of the Department of the Interior Bruce Babbitt,[1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k). On July 11, 2001, a jury found that Mr. James was qualified for a grade level increase to a GS–11 supervisory museum specialist position at the Independence National Historical Park ("INHP") and that the INHP intentionally discriminated against him on the basis of his gender. The jury awarded Mr. James $10,000 in back pay and $15,000 in compensatory damages. On July 12, 2001, this Court entered judgment in that amount. Plaintiff subsequently moved for an upgrade to a GS–11 museum specialist position at the INHP as equitable relief. As the "prevailing party," he also requests $117,000 in attorneys' fees and costs pursuant to 42 U.S.C. § 2000e–5(k).

## I. EQUITABLE RELIEF

At the conclusion of trial on July 11, 2001, I asked counsel for both parties to brief three questions:

1. Does the Court have equitable power to grant additional relief in a Title VII case?

2. If so, what relief?

3. Does the Court have the power to order the INHP to make Plaintiff a

---

**1.** On October 2, 2001, Gale Norton was substituted as Defendant in the case, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

GS–11? [2]

## A. The Court's Equitable Powers Under Title VII

Section 706(g)(1) of Title VII provides that if a court finds that a defendant has intentionally engaged in an unlawful employment practice, "the court may ... order such affirmative action as may be appropriate, which may include ... [such] equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1).

■ The purpose of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). "The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury." *Id.* "The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Id.* at 419, 95 S.Ct. 2362.

■ Title VII vests in federal courts "broad equitable discretion" to order appropriate equitable relief. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). A district court must strive to grant "the most complete relief possible" in cases of Title VII violations. *Id.* at 764, 96 S.Ct. 1251. In determining what sort of equitable relief to grant in a Title VII case, a district court must be guided by "the central goals of make-whole relief and deterrence." *Squires v. Bonser*, 54 F.3d 168, 172 (3d Cir.1995). Generally, promotion is included among legitimate means of make-whole relief under section 706(g)(1) of Title VII.

*See generally Albemarle*, 422 U.S. 405, 95 S.Ct. 2362.

Plaintiff argues that the only way to make him whole is to promote him to a GS–11 museum specialist position at the INHP, effective retroactive to the next pay day after July 11, 2001. Plaintiff argues that otherwise he will continue to suffer from Defendant's intentional discrimination in refusing to upgrade him to GS–11 after the September 1996 desk audit, which would undermine Title VII's remedial purposes. Furthermore, Plaintiff asks that his grade level reflect annual step increases for each of the five years since the 1996 desk audit. Therefore, in the year 2001, Mr. James would be classified at the GS–11 step 5 level. (Pl.'s Mot. for Att'ys' Fees & Equitable Relief, at ¶ 25.)

The Government contends that an order directing the INHP to make Mr. James a GS–11 would constitute either a re-classification of his position or the creation of an entirely new position. (Def.'s Post–Trial Br. Re: Equit. Relief, at 2.) The Government claims this Court lacks the power to do either. First, it argues that an order directing the INHP to promote Mr. James to a position that is neither presently existing nor in Mr. James's "career ladder" at the INHP would exceed this Court's authority. (Def.'s Post–Trial Br. Re: Equitable Relief, at 6–9.) Second, it argues that an order directing the INHP to re-classify Mr. James's existing job as GS–11 museum specialist would frustrate the remedial scheme of the Civil Service Reform Act of 1978. (Def.'s Post–Trial Br. Re: Equitable Relief, at 4.)

■ For the reasons explained below, I agree with Plaintiff. I find that Title VII gives me the authority to order the INHP

---

**2.** In doing so, the Court assumed that no GS–11 supervisory museum specialist position existed at the Park Service. (Trial Tr., vol. 3, at 108.) Plaintiff has not disputed that no position so defined currently exists.

to upgrade Mr. James's position to GS–11 museum specialist, whether by promoting him to a new position or by reclassifying his current position, in accordance with the jury verdict in Plaintiff's favor.

## B. The September 1996 Desk Audit

The Government contends that the jury never determined that Mr. James should have been promoted to GS–11 in September 1996 or that he was performing at the GS–11 level. (Def.'s Post–Trial Reply Br. Re: Equitable Relief, at 2.) Rather, the Government argues, the jury reached a general verdict that the INHP intentionally discriminated against Mr. James and that he was qualified for the GS–11 position. Therefore, the Government proposes that this Court order a new desk audit of Mr. James's position by an independent contractor selected by a government agency to evaluate whether the job Mr. James is presently performing meets the GS–11 classification standards or is properly classified at the GS–9 level. (Def.'s Post–Trial Br. Re: Equitable Relief, at 3 n.2, 12.) Plaintiff argues that this suggestion amounts to a request to relitigate the case, since the jury already determined that Mr. James was performing at the GS–11 level in September 1996 and would have been promoted to that level, but for the Government's discriminatory conduct. (Pl.'s Resp. Gov't's Post–Trial Br. Re: Equitable Relief, at 2.)

I cannot agree with the Government's narrow interpretation of the jury's verdict. The Government and Plaintiff collaborated on drawing up the verdict sheet. (Trial Tr., vol. 2, at 241–44 & 246–49; Trial Tr., vol. 3, at 33.) The parties chose to ask the jury for a general verdict rather than asking it to answer the specific questions whether Mr. James was performing at the GS–11 level or whether he should have been promoted to GS–11 immediately following the 1996 desk audit. Rather, the jury was asked only to state whether the INHP intentionally discriminated against Mr. James and whether he was qualified for the GS–11 position. The jury answered "yes" to both questions.

Nevertheless, there is no ambiguity in its verdict. The alleged discriminatory action at the heart of Plaintiff's complaint was that the INHP failed to upgrade him to the GS–11 level after he requested a grade increase or promotion, despite the upgrade recommendation of his September 1996 desk audit by Ms. Judith Meriwether. (Compl. ¶ 14–20; Def.'s Ex. 1.) The jury considered undisputed evidence that the 1996 desk audit recommended that Mr. James's position be reclassified as GS–11, based on the work Mr. James was actually performing. (Joint Stip. Facts, at 2; Def.'s Ex. 1.) Based on this evidence, the jury was instructed to decide whether the Government intentionally discriminated against Mr. James on the basis of his gender when it failed to upgrade him to GS–11. (Trial Tr., vol. 3 (Jury Instructions), at 81.) The jury credited the report of the September 1996 desk audit that Mr. James was performing at the GS–11 level, (Trial Tr., vol. 3, at 60; Def.'s Ex. 1, at 2), and found that Mr. James would have been promoted to GS–11 immediately following the 1996 desk audit, but for the INHP's illegal discrimination.

Therefore, I agree with Plaintiff that ordering a new desk audit of his position would indeed amount to relitigating the case and is thus impermissible. *Cf. Squires,* 54 F.3d at 174 (noting "[o]nce the jury has found in favor of plaintiff on liability, the existence of a constitutional deprivation is an established fact which may not be re-examined in the district court's subsequent determinations—including determinations of appropriate equitable remedies").

## C. Title VII Authority for Ordering Retroactive Promotion

■ The Government insists that there is no authority for an order directing the INHP to promote Mr. James to a GS–11 position. On the contrary, a district court may order a retroactive promotion if it finds that the plaintiff "would have attained the position but for the defendant's unlawful employment practices." *Richerson v. Jones*, 551 F.2d 918, 923 (3d Cir. 1977) (affirming district court's two retroactive grade-level promotions of prevailing EEOA plaintiff); [3] *Lewis v. Babbitt*, No. 97–7576, 1999 U.S. Dist. LEXIS 8824, at *12, 1999 WL 551878, at *6 (E.D.Pa. June 11, 1999) (ordering Government to promote prevailing Title VII plaintiff three step levels from GS–9–5 to GS–9–8).[4]

The Government has tried to distinguish this case from decisions ordering retroactive promotions by arguing that in those cases, the promotion was in the natural line of progression. *See, e.g. Locke v. Kansas City Power & Light Co.*, 660 F.2d 359, 369 (8th Cir.1981) (holding that job-skipping is permissible where plaintiff has demonstrated his qualification for higher level job and promotion is within natural line of progression, rather than subject to competitive promotion). The job-skipping decisions cited by the Government are not on point, however, because Mr. James is not asking this Court to place him in a higher level position than the one he was initially denied. He is asking this Court to

place him in exactly the position that he was denied. *Cf. Locke*, 660 F.2d at 368–69 (remanding for further findings where district court ordered instatement of plaintiff in position higher than position he had been denied due to discrimination, based not on evidence that plaintiff was actually qualified for promotion but on speculation that if plaintiff had been hired, he would have been promoted).

Where courts have found that a plaintiff was qualified for a promotion, they have awarded that promotion retroactively. *See, e.g., Pecker v. Heckler*, 801 F.2d 709, 711–13 (4th Cir.1986) (affirming district court order retroactively promoting plaintiff to GS–11 position, where GS–10 position that plaintiff had been illegally denied had since been upgraded and where nature of job was "substantially the same"); *Scully v. Summers*, No. 95–9091, 2000 WL 1234588, *18 & *20 (S.D.N.Y. Aug.30, 2000) (ordering IRS to retroactively promote then-retired plaintiff from GS–12 to GS–13 position he was denied substantially due to age discrimination); *Lumpkin v. Brown*, 960 F.Supp. 1339, 1353 (N.D.Ill. 1997) (ordering retroactive promotion of prevailing ADEA plaintiffs, after finding defendants discriminated by failing to place plaintiffs on career ladder according to which they would progress from GS–7 to GS–12 over four years on noncompetitive basis, and after finding plaintiffs were qualified for GS–12 position). *Cf. Smith v.*

---

**3.** In *Richerson,* the district court awarded the plaintiff three retroactive promotions: to GS–9, to GS–11, and to GS–12. The Third Circuit affirmed the first two promotions but vacated the third because the district court had not found that the plaintiff would have attained the position but for the discrimination. The court remanded to allow the district court to make such findings. *Richerson,* 551 F.2d at 923–24. On remand, the district court found that the plaintiff would have been promoted to GS–12, but for the unlawful discrimination.

*Richerson v. Jones,* 506 F.Supp. 1259, 1262 (E.D.Pa.1981).

**4.** The Government distinguishes *Lewis* because (1) it did not involve reclassification of the plaintiff's position, and (2) it authorized promotion of the plaintiff only by three step levels, which naturally occur with the passage of time, rather than two grade levels, as Plaintiff requests here. (Def.'s Post–Trial Reply Br. Re: Equitable Relief, at 1–2.)

*Derwinski,* No. 90 C 5514, 1993 WL 147536, *1, *4 (N.D.Ill. May 4, 1993) (reversing EEOC Office of Review and Appeals order of instatement and promotion to GS–11, where plaintiff had been denied GS–9 position, and there had been no finding that plaintiff was qualified for competitive promotion).

The jury has already found that Mr. James is qualified for the GS–11 position and would have attained it, but for INHP's illegal discrimination. Therefore, I find that Title VII authorizes me to order the INHP to promote Mr. James retroactively to a GS–11 museum specialist position at INHP. *See Richerson,* 551 F.2d at 923.

### D. Promoting Mr. James to a Newly–Created Position

The Government also contends that those decisions in which courts have ordered promotions as equitable relief are distinguishable, because in those cases the positions actually existed, whereas at INHP, the GS–11 museum specialist position would have to be created. The Government argues that Plaintiff's request would require the Court to write a new position description, adding duties which Mr. James does not presently do or for which he is not qualified, and requiring INHP to transfer responsibilities from other employees to Mr. James, possibly resulting in a loss of jobs. (Def.'s Post–Trial Br. Re: Equitable Relief, at 10.)

In support of its argument that this Court has no authority to order the INHP to promote Mr. James to a new position, the Government cites various decisions involving private sector defendants in which courts have ordered promotions on the occasion of the "next available vacancy." *See, e.g., Ingram v. Missouri Pacific R.R.,* 897 F.2d 1450, 1451 (8th Cir.1990) (affirming district court's ordering next available promotion for prevailing Title VII plain-

tiff); *Taylor v. Home Ins. Co.,* 777 F.2d 849, 859–60 (4th Cir.1985) (affirming district court in ordering next available promotion to qualified prevailing ADEA plaintiff upon challenge by employer).

While acknowledging their limited usefulness in Mr. James's case, the Government argues that these decisions evince courts' "powerful reluctance to disrupt organizational structure and relationships any more than absolutely necessary." (Def.'s Post–Trial Brief Re: Equitable Relief, at 11.) The Government suggests that if this Court ordered the INHP to upgrade Mr. James to GS–11, a potential flood of other employees would also request elevation to a higher grade. *Id.* at 11–12.

The Government's arguments fail for two reasons. First, the "next available vacancy" condition is usually designed to avoid bumping an innocent incumbent. *See, e.g., Johnson v. Phila. Elec. Co.,* 709 F.Supp. 98, 104 (E.D.Pa.1989) (ordering promotion of prevailing Title VII plaintiff upon next available opening, where position was occupied by innocent incumbent). *Cf. Lander v. Lujan,* 888 F.2d 153, 155–56 (D.C.Cir.1989) (affirming district court order of reinstatement to GS–16 position despite possible displacement of innocent incumbent, after finding Department of Interior had violated Title VII by placing plaintiff in subordinate job). I find that the speculative nature of the Government's concerns about future layoffs as a result of Mr. James's upgrade clearly distinguish this case from a bumping case involving a certain job loss.

Second, in those cases, the court or jury concluded only that the respective plaintiffs would have been promoted to a particular position but for the discrimination, not that they were already performing at the level of the position description. As I have already concluded, here the jury found that Mr. James was performing at the GS–

11 level at the time of the adverse employment action five years ago. *See supra* Part I.B. Therefore, Mr. James is not asking to be promoted to a position whose essential tasks he has never performed; he is asking that he be appropriately classified and compensated for the work he has been performing, as determined by the September 1996 desk audit. In short, I find that the private sector cases cited by the Government are factually and legally distinguishable.

Moreover, I do not share the Government's concern that upgrading Mr. James to GS–11 will result in a flood of other employees requesting elevation to a higher grade. (Def.'s Post–Trial Br. Re: Equitable Relief, at 11.) Although I can imagine that some employees might envy Mr. James's upgrade, I do not see why I should allow their jealousy to bar the relief to which Mr. James is entitled.

I also cannot agree with the Government's allegation that ordering the INHP to make Mr. James a GS–11 is equivalent to judicially restructuring the INHP. (Def.'s Post–Trial Br. Re: Equitable Relief, at 12.) I have already found that the jury verdict of discrimination was based on the INHP's failure to make Mr. James a GS–11 despite his proven performance at that level. *See supra* Part I.B. An order directing the INHP to upgrade Mr. James to GS–11 museum specialist interferes in INHP operations only insofar as necessary to repair the damage to Mr. James's career caused by the INHP's intentional discrimination. This is exactly the kind of make-whole relief envisioned by Title VII. *See Squires,* 54 F.3d at 172 (holding that district court abused its discretion in awarding money damages but failing to reinstate prevailing Title VII plaintiff).

### E. The Reinstatement Cases

■ Although they are not binding in this case, a comparison to the illegal discharge cases is instructive as to the equitable remedies available to this Court. When a plaintiff has been discharged in violation of Title VII, reinstatement/instatement is the preferred remedy to avoid future lost earnings. *Robinson v. SEPTA,* 982 F.2d 892, 899 (3d Cir.1993). This is partly because a plaintiff who is denied a position because of discrimination loses not only income but other benefits less easy to quantify. *See Gunby v. Pa. Electric Co.,* 840 F.2d 1108, 1110–12 & 1123–24 (3d Cir. 1988) (instructing district court to fashion equitable remedy after jury found defendant discriminated in failing to promote plaintiff four grade levels, instructing district court to take into consideration not only higher salary and benefits but nonmaterial benefits such as better surroundings and prestige).

This circuit has recognized two exceptions to this rule. The first is when reinstatement is not feasible due to animosity between the parties. *See, e.g., Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines),* 125 F.3d 120, 134 (3d Cir.1997) (upholding district court decision not to reinstate prevailing plaintiff upon finding that animosity between parties made reinstatement infeasible); *accord Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Robinson v. SEPTA,* 982 F.2d 892, 899 (3d Cir.1993); *Ellis v. Ringgold Sch. Dist.,* 832 F.2d 27, 30 (3d Cir.1987).

The second and less common exception is when the position sought by the prevailing plaintiff is unavailable. *See Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1103 (3d Cir.1995) (upholding district court finding reinstatement was not a viable option due to lack of available positions and animosity between parties); *Maxfield v. Sinclair Int'l,* 766 F.2d 788 (3d Cir.1985) (upholding district court decision awarding

front pay, where plaintiff forced to retire in violation of ADEA had not requested reinstatement, also noting that unavailability of positions or damaged relationship between parties can make reinstatement infeasible).

The Third Circuit has never required district courts to deny reinstatement where a position was unavailable. Although the Third Circuit has upheld the discretion of district courts not to reinstate prevailing plaintiffs in illegal discharge cases, these occasions are both infrequent and distinguishable. In *Maxfield*, for instance, the prevailing plaintiff, who was close to age 70 by the time the district court rendered its decision, never asked for reinstatement. *Maxfield*, 766 F.2d at 790 & 796–97. In contrast, Mr. James, age 52, has not only asked for reinstatement but has expressed a desire to continue working until age 70. (Pl.'s Submission: Pl.'s Future Salary, at 2.) In *Starceski*, the district court based its decision not to reinstate the plaintiff not only on the lack of available positions but on animosity between the parties. In this case, animosity between Mr. James and the INHP, even if it existed, could not be a determining factor, since Mr. James continues to work at the INHP. *See also Kraemer v. Franklin & Marshall Coll.*, 941 F.Supp. 479 (E.D.Pa. 1996) (awarding future damages to plaintiff in ADEA case after finding that instatement to tenure track position was infeasible, where Department had only four such positions, not all in plaintiff's field of research).

In conclusion, I do not find that the reinstatement case law constrains my equitable discretion to order the INHP to promote Mr. James to a GS–11 museum specialist position, even though that position so classified does not presently exist.

## F. Reclassification of Mr. James's Current Position from GS–9 to GS–11

█ Alternatively, the Government argues that this Court may not reclassify Mr. James's position in accordance with the recommendation of the September 1996 desk audit. The Government suggests that an order directing the INHP to reclassify Mr. James's position as a GS–11 would infringe upon the exhaustive remedial scheme established by the Civil Service Reform Act ("CSRA") of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified in scattered sections of, *inter alia*, 5 U.S.C.). The CSRA preempts judicial review of certain personnel decisions, including misclassifications, in certain cases. *Kleiman v. Dep't of Energy*, 956 F.2d 335, 338 (D.C.Cir.1992).

█ The Government cites several Courts of Appeals decisions dismissing direct challenges to position classifications under the CSRA. None, however, involve employment discrimination claims brought under Title VII. This comes as no surprise, since the Merit Systems Protection Board ("MSPB"), the administrative entity charged with review of general labor grievances under CSRA, has no jurisdiction over discrimination claims. *Facha v. Cisneros*, 914 F.Supp. 1142, 1147 (E.D.Pa. 1996). The EEOC normally has jurisdiction over employment discrimination claims. *Id.* The exception to this rule is in "mixed cases," which involve both employment discrimination claims and other employment disputes. In such cases, an aggrieved employee must choose between filing a grievance and filing an EEO complaint. *Id.* at 1147 & 1152–53 (finding HUD employee's EEO complaint involving sex discrimination claims barred under CSRA, where plaintiff had already elected to raise related employment matters in grievance filed pursuant to CBA that per-

mitted employees to raise Title VII-type claims in grievances).

This exception does not apply here, where Mr. James filed an EEO complaint raising only discrimination claims, exhausted his EEOC remedies, and timely brought his Title VII suit in federal court. Therefore, the CSRA does not preempt any equitable relief authorized by Title VII.

## G. Conclusion

In conclusion, I find that Title VII authorizes me to order the INHP to promote Mr. James to a newly-created GS–11 museum specialist position as equitable relief. Furthermore, I find that an order directing the INHP to reclassify Mr. James's position in accordance with the September 1996 desk audit neither exceeds my equitable powers under Title VII nor interferes in INHP's operations more than necessary to repair the damage to Mr. James's career caused by the INHP's discrimination.

While either of these remedies would serve the make-whole purposes of Title VII, I find that they are also compelled by Title VII's deterrent goals. The INHP has fought Mr. James's overdue upgrade with every weapon in its arsenal, even after the jury found it liable for intentional discrimination. The Government now asks that I refrain from exercising my equitable authority to order make-whole relief and instead order another desk audit of Mr. James's position. I am not sure whether the INHP is simply seeking a second chance to do the right thing or is still trying to undercut the jury's verdict. Either way, it demonstrates a profound disrespect for the judicial procedure which originally determined its liability and scant regard for the principle of equal opportunity in employment motivating Title VII. Moreover, its continued refusal to accept responsibility for remedying the result of its own wrongdoing convinces me that only an order of equitable relief will deter similar conduct by the INHP in the future.

Therefore, I will order the INHP to upgrade Mr. James's position to GS–11 museum specialist, retroactive to July 11, 2001. In light of this decision, I do not need to consider other equitable alternatives. Moreover, in view of the INHP's expressed interest in its own classification scheme and organizational structure, I will permit the INHP to decide whether to upgrade Mr. James's position by promoting him to a newly-created GS–11 museum specialist position or by reclassifying his current position as GS–11 museum specialist.

## II. PETITION FOR ATTORNEYS' FEES

Plaintiff also seeks reimbursement totaling $117,221.80 for work performed by Mr. Olugbenga Abiona, lead counsel during litigation and at trial, and by Mr. Albert Michell, associate counsel, plus costs. The Government has challenged Plaintiff's fee petition and asked this Court to reduce the award by at least 50%. In particular, the Government has challenged Mr. Abiona's $500 billing rate for trial matters, all counsel fees for Mr. Michell, the assignment of paralegal billing rates for secretarial work, the assignment of top billing rates for "mid-level associate work," billing for unnecessary hours, and excessive costs.[5]

---

**5.** In correspondence dated October 10, 2001, Plaintiff reduced his requested billing rate for Mr. Abiona's trial work from $500 per hour to $250 per hour. This reduced amount is exactly what the Government requested in response to Plaintiff's fee request. In light of this change in position, I do not need to address the Government's challenge to Mr. Abiona's $500 billing rate for trial matters.

For the reasons set forth below, I will reduce Plaintiff's award in part, in light of the Government's objections. In particular, I will award counsel fees for Mr. Abiona at a $250 hourly rate, but reduce some of his billable hours as excessive; I will award Mr. Michell only limited counsel fees; I will award paralegal fees at a reduced hourly rate; and I will reduce certain of Plaintiff's costs.

## A. Legal Standard

 The party seeking attorney's fees has the burden to prove that its request is reasonable. *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir.1990). To meet its burden, the fee petitioner must submit evidence to support the hours and billing rates it claims. *Id.* In a statutory fee case such as this one, the burden then falls on the party opposing the award to challenge the reasonableness of the requested fee with specificity by affidavit or brief. *Id.*

 District courts have a "positive and affirmative function in the fee fixing process." *Loughner v. Univ. of Pittsburgh,* 260 F.3d 173, 178 (3d Cir.2001). Courts have "a great deal of discretion" to adjust the fee award in light of the objections raised by the adverse party. *Bell v. United Princeton Props.,* 884 F.2d 713, 721 (3d Cir.1989). A district court must make a good faith effort to exclude from fee requests hours that are excessive, redundant, or otherwise unnecessary. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In addition, district courts must guard against "double dipping"—i.e. "[a] fee applicant cannot demand a high hourly rate-which is based on his or her experience, reputation, and presumed familiarity with

the applicable law-and then run up an inordinate amount of time researching that same law." *Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983).

## B. Mr. Abiona's Counsel Fees

Plaintiff asks this Court to award him $86,900 for Mr. Abiona's 347.6 hours of work, calculated at the billing rate of $250 per hour.[6]

### 1. *Reasonableness of Hourly Rate*

The Government argues that Mr. Abiona has impermissibly billed $250 per hour for certain "mid-level associate work," such as drafting the complaint, responding to the Government's motion to dismiss, answering the Government's interrogatories, preparing a brief in opposition to the Government's summary judgment motion, preparing pretrial memoranda, preparing a brief in opposition to the Government's final pretrial in limine motion, and reviewing correspondence. The Government does not dispute that this work is properly performed by attorneys, but argues that it should be billed at the rate of $150 per hour.

In support of its position that this principle applies in this case, the Government relies on the Third Circuit's recent decision in *Loughner,* which vacated an award of attorneys fees in a wage and overtime case. The district court had reduced the prevailing attorney's requested hourly rate from $250 to $175 per hour without explanation. *Loughner,* 260 F.3d at 177–79. The Third Circuit remanded and directed the district court to articulate a basis for its fee award. It also found that it was not fair or reasonable for the plaintiff to

---

**6.** In light of his Oct. 10, 2001 correspondence, I have calculated that Plaintiff now requests that Mr. Abiona's billing rate be $250 per hour for 347.6 hours of work, totaling $86,900.

charge his maximum billing rate for legal research or drafting a brief. *Id.* at 177.

*Loughner* is factually and legally distinguishable, however, on two grounds. First, *Loughner* was a "simple" wage and overtime case. *Id.* at 179. The legal issues in an employment discrimination case are much more complex. *Id.* at 177 (noting that trial judge had found that employment discrimination cases are "much more complex" than wage and overtime case in *Loughner*). In addition, Plaintiff's case has raised at least one novel legal issue regarding equitable relief under Title VII. *See generally infra* Part I.

■ Second, *Loughner* does not govern this case because the plaintiff's lawyer in *Loughner* was not a solo practitioner, as is Mr. Abiona. *Loughner*, 260 F.3d at 174. Mr. Abiona is not a partner in a firm who can delegate work to more junior attorneys. *Cf. Ursic*, 719 F.2d at 677 (holding that "[r]outine tasks, if performed by senior partners in large firms, should not be billed at their usual rates"). I find it unreasonable to require a solo practitioner with 12 years of experience to bill at a mid-level associate rate for expenses properly billable to attorneys.[7] (Pl.'s Mot. Att'ys' Fees & Equitable Relief, Ex. H.)

The unpublished opinion in *Lewis v. Babbitt* is factually similar to this case but does not control it.[8] *Lewis v. Babbitt*, No. 97–7576, 1999 U.S. Dist. LEXIS 8824, 1999 WL 551878, at *2 (E.D.Pa. June 11, 1999) (reducing fee award to plaintiff's attorney, a solo practitioner, from $250 to $150 per hour, for work of drafting complaint, indexing file, legal research, and preparing summary judgment motion, pretrial memorandum, trial exhibits, and fee petition in Title VII case). The decision reached by the *Lewis* court was not compelled by precedent in this Circuit, and I am not convinced by its reasoning. I find that it was reasonable for Mr. Abiona, as a solo practitioner representing the prevailing plaintiff in an employment discrimination case presenting novel issues of law, to bill for the performance of essential legal tasks at his ordinary billing rate of $250.

### 2. *Reasonableness of Hours Expended*

The Government claims that Mr. Abiona has billed an unreasonable number of attorney-hours for a wide range of legal work including discovery, correspondence, motions, and trial preparation.

■ First, the Government asks this Court to reduce Mr. Abiona's billable hours for the following tasks:

---

**7.** Other decisions in this district ordering the reduction of attorneys fees are similarly distinguishable for reasons of either complexity of subject matter or firm size. *See, e.g., Jackson on Behalf of Jackson v. Phila. Hous. Auth.*, 858 F.Supp. 464, 475–76 (E.D.Pa.1994) (ordering fee reduction from $210 to $150 for community services attorney in "ordinary landlord-tenant dispute" who "made no attempt to resolve [it] prior to filing suit"); *Clark v. Phila. Hous. Auth.*, No. 93–4890, 1995 U.S. Dist. LEXIS 3824, 1994 WL 220022 (E.D.Pa. May 25, 1994), *rev'd on other grounds*, 43 F.3d 1460 (3d Cir.1994) (ordering fee reduction from $210 to $150 per hour in "routine case involving no difficult or novel issues").

**8.** In *Richerson v. Jones*, the district court awarded the plaintiff three retroactive promotions: to GS–9, to GS–11, and to GS–12. The Third Circuit affirmed the first two promotions but vacated the third because the district court had not found that the plaintiff would have attained the position but for the discrimination. The court remanded to allow the district court to make such findings. *Richerson*, 551 F.2d 918, 923–24 (3d Cir. 1977). On remand, the district court found that the plaintiff would have been promoted to GS–12, but for the unlawful discrimination. *Richerson v. Jones*, 506 F.Supp. 1259, 1262 (E.D.Pa.1981).

1. reviewing the Government's three-page motion to dismiss (from 3 to 0.25 hours),

2. drafting a six-page brief in opposition (from 22 to 6 hours),

3. reading the Government's one-page reply (from 3 to 0.25 hours),

4. preparing interrogatories answers (from 11.3 to 2 hours),

5. preparing a pretrial memorandum (from 9 to 2 hours),

6. drafting Plaintiff's brief in opposition to the Government's final pretrial in limine motion (from an estimated 12.5 to 6 hours),

7. reviewing Government's summary judgment motion, motion in limine, pretrial memorandum, and 12 exhibits (from 8.9 to 2 hours), and

8. preparing jury instructions (from an estimated 11 to 2 hours).

In total, the Government requests a reduction from 80.7 hours to 20.5 hours. In support of its request, the Government offers its own opinion that the requested number of hours is unreasonable and the fact that the filings in question relied on routine wording and/or legal arguments. I am only partially convinced. I find that the Government has understated the number of pages that Mr. Abiona had to analyze, since some of these motions contained attached exhibits. (Pl.'s Resp. to Gov't's Opp'n to Pl.'s Fee Pet., at 3–4.) Moreover, most of the work identified by the government lay at the heart of the litigation. I find it reasonable that during the two years of this litigation, preparation and/or analysis of some of these documents required Mr. Abiona to think about and even refresh his memory as to details of the ongoing investigation, requiring extra expenditure of time.

Nevertheless, in view of Mr. Abiona's high hourly rate, some of this time was clearly excessive. *See Rainey v. Phila. Hous. Auth.*, 832 F.Supp. 127, 130 (E.D.Pa.1993) (noting "the higher the allowed hourly rate commanded based on skill and experience, the shorter the time it should require an attorney to perform a particular task"). Therefore, I will permit Mr. Abiona to collect a fee for 1.5 hours reviewing the Government's motion to dismiss, 8 hours to draft an opposition brief, 0.5 hours to review the Government's reply, 4 hours to preparing interrogatory answers, 5 hours to prepare a pretrial memorandum, 9 hours to draft an opposition brief to the Government's final pretrial in limine motion, 6 hours to review the Government's summary judgment motion, motion in limine, pretrial memorandum, and 12 exhibits, and 6 hours to prepare jury instructions. Accordingly, I will reduce Mr. Abiona's billable time by 40.7 hours.

The Government also asks this Court to strike entirely Plaintiff's fee request for the 10.5 hours Mr. Abiona spent drafting a response to the Government's March 16, 2000 motion in limine, which was never filed. I find that the Government has understated the persuasiveness of its own work. I find it was reasonable for Mr. Abiona to spend time researching and analyzing the issues raised by the Government, before concluding that Plaintiff's interests would not be served by opposing its motion. But Plaintiff has failed to show that 10.5 hours is a reasonable amount of time to spend, and therefore I will reduce the amount to 5 hours.

The Government also asks this Court to reduce by 90% Plaintiff's fee request for the 4.7 hours Mr. Abiona spent reviewing short and routine correspondence over 26 months of litigation in this case. The Government acknowledges that the "great majority" of entries reflect the expenditure of just 0.1 hours, and it does not dispute that

0.1 hours is the minimum amount of time Mr. Abiona could bill per piece of correspondence. (Gov't's Br. in Opp'n to Pl.'s Fee Pet., at 12.) Therefore, I am not convinced that Mr. Abiona spent this time unreasonably.

In summary, I will reduce Mr. Abiona's billable time by 46.2 hours.

## C. Mr. Michell's Counsel Fees

Plaintiff requests $8,487.50 in attorneys fees for Mr. Michell's 48.5 hours of work in the case.[9] As modified by Plaintiff's October 10, 2001 correspondence, Mr. Michell claims a single billing rate of $175.00. The Government has asked this Court to strike Mr. Michell's request for counsel fees in its entirety.

### 1. *Reasonableness of Hourly Rate*

A court determines a reasonable hourly rate by assessing the prevailing attorneys' experience and skill and comparing their rates to the prevailing market rates in the relevant community for lawyers of reasonably comparable skill, experience, and reputation. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir.2001). The prevailing party, here Plaintiff, bears the burden of showing that the requested hourly rates meet this standard. *Id.*

■ Plaintiff has requested that Mr. Michell's fee be calculated at a rate of $175 per hour. (Letter from Plaintiff to Court of 10/10/01.) The Government has asked me not to award fees to Mr. Michell, but it did not specifically challenge his $175 billing rate.

I find that $175 per hour is reasonable. Mr. Michell has been a member of the bar for almost six years. In accordance with Plaintiff's challenge to compare Mr. Michell's billing rate with the hourly rates of a "six year associate or partner" in the Phil-

adelphia legal community, I have consulted the Community Legal Services (CLS) fee schedule, which is based upon a survey of hourly rates charged by private law firms and individual practitioners in Philadelphia. *See Rainey*, 832 F.Supp. at 129 (accepting CLS fee schedule as fair reflection of attorneys' marketplace billing rates in Philadelphia); *accord Rivera v. Phila. Hous. Auth.*, No. 97–7976, 1999 U.S. Dist. LEXIS 19140, at *6–11, 1999 WL 1215584, *2–4 (E.D.Pa. Dec.7, 1999); *Jones v. Phila. Hous. Auth.*, No. 99–0067, 1999 U.S. Dist. LEXIS 16380, at *6, 1999 WL 972006, *2 (E.D.Pa. Oct.19, 1999). According to the CLS fee schedule effective as of Plaintiff's trial, attorneys with 5–6 years' experience might expect to earn about $160 per hour. COMMUNITY LEGAL SERVS., INC., ATTORNEYS FEE SCHEDULE OF HOURLY RATES (effective Nov. 15, 1998).

Two of Plaintiff's affiants value Mr. Michell's work at $200 per hour. In light of Plaintiff's affidavits and the average marketplace billing rates of attorneys with Mr. Michell's experience, I will grant Plaintiff's request to award Mr. Michell fees at the rate of $175 per hour.

### 2. *Reasonableness of Hours Expended*

Mr. Michell has billed for 48.5 hours in this case. He spent over half of this time attending trial. Otherwise, Mr. Michell's primary role in the case was to review the file and assist Mr. Abiona with trial preparation.

As the Government has pointed out, Mr. Michell played a very small role in this litigation. He performed no work in the case at all until about five weeks before trial. At trial, he assisted Mr. Abiona in reading a deposition, but did not otherwise

9. I have recalculated Plaintiff's fee request in light of his Oct. 10, 2001 correspondence.

speak. He did not handle a single witness. While it may be true, as Plaintiff attests, that Mr. Michell single-handedly tries his own cases, (Pl.'s Resp. to Gov't's Opp'n to Pl.'s Fee Pet., at 4), the fact remains that Mr. Michell did not actively participate in trying *this* case. Mr. Abiona has not cited any *concrete* and *legal* contribution made by Mr. Michell at trial. Mr. Michell was similarly silent at the pretrial conference, for which he has requested fees. While Plaintiff may be correct in claiming that the Government also had a "second-seat" at trial, (Pl.'s Resp. to Gov't's Opp'n to Pl.'s Fee Pet., at 5), Plaintiff cannot win attorneys fees based simply on a two-heads-are-better-than-one theory. *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 943 (3d Cir.1995) (noting that fact that private client may agree to pay additional fees for attendance of additional counsel at deposition does not necessarily make them reasonable or necessary when they are to be paid by other party). I will deny Mr. Michell fees for the 26.3 hours he spent attending trial and the pretrial conference.

Mr. Michell also reports having spent 11.8 hours reviewing the case file, deposition transcripts, and the Government's jury instructions for possible objections. Upon comparison of Mr. Michell's with Mr. Abiona's Statement of Legal Fees, however, I find that about 4.4 hours of Mr. Michell's work was duplicative. Five out of the ten deposition transcripts reviewed by Mr. Michell (of Meriweather, Diethorn, Aikens, Fanelli, and Russell) had already been summarized by Mr. Abiona. Mr. Abiona had likewise already reviewed the Government's jury instructions. I will deny Mr. Michell fees for the 4.4 hours he spent duplicating Mr. Abiona's efforts. *See Evans v. Port Auth.*, 273 F.3d 346 , 361(3d Cir.2001) (finding duplicative billing by two law partners in Title VII case unreasonable). I will award Mr. Michell

fees for the remaining 7.4 hours he spent reviewing documents.

Finally, Mr. Michell reports having spent 10.4 hours helping Mr. Abiona to prepare for trial. Mr. Abiona avers that Mr. Michell's help was invaluable. (Pl.'s Resp. to Gov't's Opp'n to Pl.'s Fee Pet., at 5.) I find it reasonable for Mr. Abiona, who is a sole practitioner, to enlist Mr. Michell's help as a "sounding board" in preparing for trial.

In summary, I find that 17.8 hours of Mr. Michell's expenses were reasonable, and I will strike the remaining 30.7 hours of his fee request.

### D. Assignment of Paralegal Billing to Clerical Work

Plaintiff requests $4,657.50 for 62.1 hours of paralegal time calculated at the rate of $75 per hour. *See Missouri v. Jenkins*, 491 U.S. 274, 285–88, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (permitting paralegal and secretarial costs in the evaluation of attorneys fee awards under Title VII).

The Government argues that the hourly rate should be reduced because almost all of the entries for paralegal work are for typing. Plaintiff also reports a small amount of copying, hand delivery of documents, and organization of documents. The Government argues that it would be unreasonable to award $75 per hour for such "clerical" tasks. *See Missouri v. Jenkins*, 491 U.S. at 288, 109 S.Ct. 2463 (stating that "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them").

According to the November 15, 1998 CLS fee schedule, junior paralegals earn between $45–65 per hour, and senior paralegals earn up to $90 per hour. I agree with the Government that it is un-

reasonable to bill at a senior paralegal rate for typing. *Cf. In re Meese,* 907 F.2d 1192, 1203 (D.C.Cir.1990) (deducting paralegal and law clerk charges for "clerical" tasks such as photocopying and delivering and picking up documents). Therefore, I will permit Plaintiff to collect paralegal fees for 62.1 hours of paralegal time, calculated at a junior paralegal rate of $50 per hour.

### E. Excessive costs

Plaintiff also asks for $3,454.30 in costs. The Government objects to three ingredients of this request: fees for photocopying, postage, and hand deliveries.

■■■ First, the Government suggests that duplicating costs should be billed at $.10 per page, rather than $.25 per page, pursuant to Rule 39.3(c)(2) of the Third Circuit Local Appellate Rules. This case is not governed, however, by the Third Circuit Local Appellate Rules. I find that charging $.25 per page for photocopying costs is reasonable. *See Churchill v. Star Enters.,* No. 97–3527, 1998 U.S. Dist. LEXIS 6068, *29–30, 1998 WL 254080, *10 (E.D.Pa. Apr.17, 1998) (permitting assessment of photocopying costs at $.25 per page as "very reasonable").

■■■ The Government also challenges $57.65 in postage costs, including four $10 charges for hand deliveries, as well as $175 for a hand delivery by Mr. Abiona.[10] Since postage and courier fees are not taxable in the Third Circuit, *Matter of Penn Cent. Transp. Co.,* 630 F.2d 183, 191 (3d Cir. 1980), I will not award Plaintiff these costs.

### F. Calculation of Fee Award

In summary, I will award Plaintiff fees and costs for the following:

**10.** (0.7 hour) * ($250 per hour) = $175.

(1) Mr. Abiona's work: (301.4 hours) * ($250/hour) = $75,350;

(2) Mr. Michell's work: (17.8 hours) * ($175/hour) = $3,115;

(3) Paralegal work: (62.1 hours) * ($50/hour) = $3,105;

(4) Costs: ($3,454.30—$175—$57.65) = $3,321.65.

Plaintiff's total award is $84,791.65.